Okay, thank you. We will resume with EEOC v. Center One and Demetrius Ford. The question today is whether, viewing the record in the light most favorable to the plaintiffs, Mr. Ford suffered a serious and tangible adverse employment action arising from the unaccommodated conflict between his religious practice and his attendance at work. The answer is yes, and the District Court's contrary conclusion rested on a misapplication of the summary judgment standard. Before we get to adverse action, on the issue of sincerity, the District Court didn't question the sincerity and found that it was deemed admitted. On the other hand, it went forward with this analysis about the reasonableness of the verification requirement, which would not seem to come into play unless there was an objective basis to question sincerity. So, should we take the District Court as having resolved that issue, or is it still an open issue? It's a great question. I agree that the reasonableness question doesn't comfortably fit in any of the elements of the prima facie case. And we did address sincerity and notice in an abundance of caution because it could arguably go to those factors. But Center One doesn't dispute sincerity or notice, and I think the reasonableness inquiry of this official letter requirement is just really inappropriate in the accommodation context. The case law is pretty clear that as a general matter, employers should assume that their employees' requests for religious accommodation come from a sincere place of a true religious conviction. That's, I think, apparent in the Shelton case. Nobody's questioning sincerity. The question is they needed some type of backup because of their company policies. If you can give us something, we'll consider this and not take any attendance points. We'll take them off the tally, so to speak. So, I didn't see anything in here that was questioning his sincerity. I agree that there's not anything in the record that Center One had any questions about Mr. Ford's sincerity. Their request was very specific. It was for a letter on an official letterhood from a congregation. And that was something that Mr. Ford could not meet. And the case law does not support asking for something that specific, principally because Title VII protects religious beliefs that are not part of an organized religion. And so it would extend beyond what Title VII protects or limit the accommodations that Title VII protects. And again, I think the Shelton case makes clear that employers can't insist on a specific form of notice from an organized religion. And in the general run of cases, it is the employee's description of their religious belief that should be sufficient. Wasn't there some confusion about exactly what holidays he needed to observe and didn't need to observe? And wasn't a letter on the official letterhead of the church telling him what those holidays were something that would aid in providing information that he himself was unable to provide? There is not any evidence that Mr. Ford expressed confusion in 2016 as to the dates that he needed to be absent from work. Mr. Ford testified that he told Ms. Altman, a human resources assistant, one to two days before Rosh Hashanah, that he needed to take those two days off. And that was the first absence for religious reasons. And then upon his return, provided the calendars to Andrea Brugos, the human resources generalist, which provided the dates of the additional holidays that he would need to miss work. There's no indication that he expressed any confusion contemporaneously with the events at issue. The district court noted confusion that arose in Mr. Ford's deposition, which was taken in 2021, some four and a half years after the events in question, in which Mr. Ford cannot recall the exact dates that he observed the religious holidays. But the record shows that he did take the dates that were listed in the calendar for Rosh Hashanah and for Yom Kippur and that he didn't express confusion at the time. Wasn't there, he raised questions about the calendar that was initially printed out and whether that was accurately reflecting what the holidays would be and indicated that he would need to get the specific dates from the leader of this synagogue or church. And it was that correspondence that he then offered. But he himself, without that additional support, didn't seem to be able to identify which holidays they were or the dates of them. Right? Respectfully, I'm not sure that's exactly what the record shows. He did testify that he prefers the guidance of a religious leader, which he did not have the benefit of at this time because his rabbi had gone uncommunicative. But he testified that he learned within about a week ahead of Rosh Hashanah what the dates of that holiday was and then alerted his employer. And then he knew as of the date that he received the calendars from the Rock of Ages congregation, which that email is dated October 4th. He knew at that point the remainder of the holidays that he had to observe. And as I mentioned, there's not any indication that he expressed confusion to Center One about what dates he would need to be absent. I think he testified that, of course, in an ideal world, he has the guidance of a rabbi when observing these holidays. But any confusion was simply reflected in the deposition four and a half years later when he couldn't recall exactly when the holidays took place in 2016. We're dealing with whether he has a prima facie case and no one's arguing about his sincerity or the notice of the employer that he had given. So in connection with making out a prima facie case and asking for some backup on official letterhead, how is that unreasonable? It's unreasonable for a couple of reasons. First, the facts of the case made it unreasonable because as of October 12th at the latest, Center One knew. Andrea Brugos testified that she knew that Mr. Ford could not reach his rabbi, that the prospective congregation would not write a letter for him, and therefore that he had no present ability to produce the letter that Center One was requiring. They still didn't say at that point, you're done. Well, was it on the 19th or 20th? It's a little bit unclear. He just said, I give up, I'm resigning, right? What they said on October 12th was he testified that Andrea Brugos told him he could have no more NXT's absences. And they also told him at that meeting that they would accommodate him only with the official letter on a letterhead, which, as I just mentioned, they knew he could not provide. Is it unreasonable to ask for the letterhead or something that's back up? It is unreasonable for the reasons I stated because of the facts of the case and also for the legal principle that I recited earlier, that Title VII protects more than religious beliefs that are embraced by an organized religion that are necessarily part of a congregation. I think the consul energy case does a good job of showing that. I get that, what you're saying. So there will be many circumstances where an employee will have a religious belief and will be unable to get an official letter from an organized religion. Sorry. Go ahead, why don't you finish your thought and then I'll come in. There also was external verification in that Mr. Ford gave Ms. Brugos an email from the Rock of Ages congregation, which of course was not his congregation and they wouldn't write a letter for him, but he had an email from one of the leaders of that congregation sending forth the holidays. He was an at-will employee, right? He was an at-will employee. And what did that mean in this particular case? I don't think it means much because as this court said in the Wilkerson case, at-will employment doesn't mean that you can take adverse action against employees because of discriminatory reasons. It doesn't excuse employers from the requirements of Title VII. Go ahead, why don't you go ahead. To go back just a bit, if you are an employer, do you not often need to know when an employee is going to be able to take, is going to want to take permitted time off from work? And although at one point Mr. Ford knew that Rosh Hashanah and Yom Kippur were coming up, that he never seemed able to project the whole, this is the church year, this is the whatever, this is the program of religious observations I have to make during the year, and yet is an employer not justified in saying, well, look, in planning our staffing, we need to know when you'll be here, when you won't be here, and to ask the religious organization on their official letterhead or off their official letterhead to give a list, which he apparently couldn't do for the whole year of what the obligations were, I think is a reasonable request. I have a few responses to that question. I'm not sure that there's any record evidence that Center One asked him to produce a list for the whole year. What he gave them was a calendar of upcoming holidays, and the reason that they gave for that being insufficient is not that it didn't provide them with advance notice of the days he would need off. It was that it did not meet their policy, which required a letter on official letterhead. All of the human resources representatives described this as a company policy that would apply to anyone asking for religious accommodation, not simply to Mr. Ford because of some inadequacy in the way that he requested an accommodation. And, in fact, the corporate representative for Center One testified that the way to ask for an accommodation would be to go to speak with human resources, which is exactly what Mr. Ford did. So I think the record shows that Center One did have notice of the upcoming holidays, and they didn't request any further information, and that they just insisted on the letterhead because that was their company policy. Isn't your primary purpose being, or at least when I looked at the briefs, to try to get us to alter our test that we used for what is a prima facie case? That is certainly not our primary purpose, Your Honor. We think that the record is very clear that a reasonable jury could find that Mr. Ford was constructively discharged, and we think that the facts fall comfortably within well-established law for constructive discharge. We also think that Mr. Ford suffered a serious and tangible adverse action by virtue of the enforcement of the attendance policy against him under the Court's current standard. We merely noted in a footnote that some courts have been revisiting the standard for adverse employment options under Title VII and that it is implicated in a current case before the Supreme Court. But intolerable conditions is our current standard? Yes, for constructive discharge certainly, yes. And we haven't adopted this concept of a Hobson's Choice as rising to the level of intolerable condition. It's true, but I don't think that this case requires the Court to extend the law in any meaningful way. We're merely asking to apply well-established principles to a new factual circumstance. So Title VII obviously forbids discrimination on the basis of religion and requires accommodation absent undue hardship. And the law of constructive discharge is well settled that when an employee faces intolerable choice, we treat a resignation in that circumstance as a termination. I think the inevitability of the Hobson's Choice case law is not meaningfully different from intolerability in this case because the circumstance that Mr. Ford was facing was that his employer was requiring him to choose between observing his faith and keeping his job, which we describe as intolerable, but really the only choice he had in that. Do the facts here show a Hobson that they presented him with a choice? It's either you come in, have no more attendance points against you, or you're going to be fired. Did they say that to him? The record shows, I think, that a reasonable jury could find that he was objectively reasonable in understanding that to be Center One's position, given that on October 12th at the Employment Review Committee meeting, they told him, you can have no more unexcused absences, and they told him— And by the way, he did take another half a day, did he not? I don't think that—I think that's the day that he resigned, and he was docked a half attendance point for leaving early when he was asked to leave. There's no record evidence that he was absent, unexcused absent that day. I think that's the day that he resigned. But, again, if the employer has to get the job done, and certain days are very important, like Mondays, then how is it unreasonable to say, okay, we won't dock you, but just give us some backup? That doesn't seem like that's a Hobson's choice or anything that's even unreasonable, and essentially I would just echo Judge Roth's question. We're not arguing that that's per se unreasonable, but I don't think that that accurately describes the facts here. They weren't saying give us some backup. They were saying give us a letter on an official letterhead from a congregation, which by October 12th they knew Mr. Ford could not do, and he did give them some backup in the form of the email from Rock of Ages, which listed the holidays. Where is there any indication or is it pleaded that he returned to them and said definitively that he could not acquire such a letter? Yes. So the district court, I think, said that he continued to represent that he would try, but that is disputed. That's a disputed fact. Center One in their brief repeats that but cites to Mr. Ford's testimony that on October 5th, a full week before the ERC, he told Ms. Brugos that he would try to get a letter. Mr. Ford describes the ERC as ending after he says, do I need a lawyer? This meeting is over and leaving. He did not testify that he told Center One that he would continue to try to find a letter, and as I mentioned before, Ms. Brugos testified that she knew that he couldn't get one at that point. Well, isn't the last thing that they're left with that he is trying to get a letter? He doesn't tell them that that has become an impossibility, and they don't say to him at that meeting that he's going to be fired, even inevitably, if he doesn't produce that letter, and, in fact, they vote not to fire him. So they voted not to fire him, and Ms. Fulson-Needy testified that they were going to keep his points as was unless he had something more to submit, which shows that they are continuing to insist on this requirement, and I will point your honor to the record to Ms. Brugos' testimony at pages 248 and 249 where she admitted that she knew that Mr. Ford could not get this letter as of the Employment Review Committee meeting. Nobody communicated with Mr. Ford after the Employment Review Committee meeting, and the message that he left that meeting with was you can have no more unexcused absences, and we will accommodate you only if you meet this very specific requirement. So I think he was objectively reasonable, a jury could find, in perceiving that Center One would fire him if he had another absence, and I think that's the whole point of the constructive discharge theory is an employee doesn't have to wait around to actually be fired when they are put in this type of a circumstance. They can, you know, preserve their dignity and, in Mr. Ford's case, honor his faith and avoid the mark of a termination on his record by resigning, but because of the circumstances, we treat that as if the employer had terminated him. I see that my time is up. If there are no further questions, I will speak with you soon. Okay. May it please the Court, Zabah Hak on behalf of Appellant and Intervenor Demetrius Ford. To follow up as my colleague from the EEOC has aptly just argued, this case really focuses on Center One's singular and consistent demand for a clergy letter as a condition to accommodate Mr. Ford's religious observance. And the Court just asked my colleague evidence that Ford said he couldn't get the letter, and I'd point the Court to two places in the record, the unemployment questionnaire at 684 and the personal action form at 647 and 668. These both indicate that Mr. Ford approached HR and stated that he would not be able to get the proper documentation for his religion, and so he is forced to resign. And in addition to that contemporaneous evidence, you have Brugge's statement, which can be found at 430 to 431 of the record, where she says he advised Heather that he would like to resign at this time since he will not be able to provide us with the documentation we need. Heather Altman's statement at 433 echoes the same thing, that he said that he could not continue to work for a company that did not accommodate his religious beliefs. That's why I explained to Demetrius that we are more than willing to help accommodate his religious beliefs. It's just that we need a letter from his rabbi. One question that I have is if Mr. Ford was an at-will employee, how could any change in attendance points make him eligible for termination, making him eligible for termination constitute a material change in the terms of his employment? Because my understanding of at-will is you're in probation, and pretty much for any reason they can say during those X number of days of probation, often 90, it's not working out. Well, Your Honor, I would just echo what Ms. Yeomans just said, which is that at-will employment does not undermine or undercut Title VII's requirement of providing religious accommodation. So to the extent that Senator Warren here gave him termination-triggering points and basically told him you can not miss any additional… Does that at-will mean that even if I get up on the wrong side of the bed and decide that I don't want you here today during that at-will period, there's not much you can do about it? Well, I think I would – I think if you see the Supreme Court guidance on EEOC versus Abercrombie where the Court held that even a motivating factor, even if it's a motivating factor to avoid religious accommodation, that allows… Well, my example was not a motivating factor for a lack of religious accommodation. It's just I don't want this guy here. It's not working out. And I would say that that's not what happened here. I mean, here you have a case where Mr. Ford was put to the Hobson's choice between choosing between his faith and his – keeping his job. And that is something that Title VII does not allow under the statute. Do we have to accept that he would inevitably be terminated to agree with that theory, that there was Hobson's choice here? So inevitable termination is not the only context in which Hobson's choice comes up. Hobson's choice comes up in cases such as the Fifth Circuit case, Young, in Consul, Mathis, and Yochim in this circuit. Those are all under the intolerability analysis. So it doesn't require a finding of inevitable termination, but we would say that in this case, putting him to that choice, basically including the insistence on the letterhead, the termination triggering points, the last step meeting scheduled on his holy day where he was told he could not make any more absences, his inability to produce a verification, in fact, Center I's rejection of the verification that he provided, as anyone could print this from the Internet, and the upcoming holy days for which he would need to be absent. Once Center I knew when Mr. Ford resigned that he could not provide that letterhead and he needed time off for his religious observance, that basically put him to the Hobson's choice, and he was subject to termination at that time. He believed so, and they continued to insist on the letterhead in a way that indicated that he was subject to termination without the letterhead. So, in effect, are you asking us to adopt an inevitable termination test as opposed to the intolerability test that we currently have? I agree with the EEOC that that's not required here. There's established case law that basically states that putting an individual to a Hobson's choice between their religion and their job can itself be intolerable, and I think here we have certain aggravating facts. For instance, the fact that there was a consistent insistence on this letterhead, the holy day ERC meeting where he questioned whether he needed an attorney, there's a comment that was said such that, it's your holy day, why are you even here today? So there's a lot of facts here that really allow for a reasonable jury to conclude that there was constructive discharge under an intolerability analysis. What possibility is it to open the discussion about alternatives to the letterhead from clergy? And part of your colleague's argument is that this really should have just, this was a back and forth between employer and employee. They could have worked something out, and he just went ahead and resigned. So where, if he was really unable to, where does the responsibility lie to raise the alternatives? Right. Well, the responsibility to engage in interactive process is on both sides, and the record reflects, I think the record doesn't reflect that, or it's at least disputed that Mr. Ford just unilaterally walked away. He tried to comply with the requirements of Center 1. First, he actually provided internet printout of calendars. Those were rejected, as anyone could print those. Then he came back with emails that indicated that he was in touch with a congregation and certain additional dates of their services, and that was also rejected. He continued to correspond with the congregation, as we can see from the record, but he was unable to get it. Now, I think that the interactive process requires that at the point at which he comes and says, I cannot get this letterhead, and he had already provided significant materials to show his sincerity, the dates of his holidays, at that point it was on Center 1 to engage in the interactive process. And if it had a policy, in fact, that what he had provided was already sufficient, that they should have and had an obligation to come to him and say, well, you don't need the letterhead, and what you've provided is sufficient. Well, providing the calendars may be sufficient for notice about the holidays. I'm not sure, certainly with what we have on briefing from Center 1, that sincerity really has been conceded. They seem at pages 44 to 45 to be arguing about there being an objective basis to question the sincerity of his beliefs. And for that, a calendar wouldn't seem to be sufficient. So if sincerity were ‑‑ if there is an objective basis to question sincerity, and that is still a live issue in the case, what sort of a letterhead would show that, particularly where he has indicated in his testimony that he would look to the leadership of a rabbi to know which holidays there were and to lead in worship, and that he hadn't been in touch with his prior rabbi for at least six months and didn't seem to be getting in touch with any new congregation until he was asked for verification? So first I would say that to the extent that Center 1 is disputing his sincerity, the district court rightly found that sincerity was not an issue, since the only thing that Center 1 could point to was allegations in its answer. As to the pastor point, the issue of whether Mr. Ford needed a pastor, the record actually reflects that he was trying to get verification from a pastor. He mentioned that he had been trying to get in touch with Mark Guy, number one. Number two, the correspondence with the congregation that's found in the record at 621 to 629 actually indicated that he contacted that congregation before October 4th, trying to ask them information about holidays and services. So the record is actually consistent with his testimony that he would like to have a pastor confirm the dates of his holidays. So to the extent that sincerity is at issue, there's really no record evidence that he was not sincere, and if Center 1 had any sincerity questions, they should actually have been allayed by that correspondence that he showed them with the congregation that indicated his commitment to his faith. And anything more than that really, you know, goes to the point that my colleague at the EEOC was saying, that you start discriminating against people who don't have a particular congregation at that time. And Title VII's protections are broad, and they don't only protect people who are a part of a congregation. I see my time is up.  Thank you. We ask the Court to please reverse and remand for trial. Good morning, Your Honors. May it please the Court. My name is Emily Mahler. I'm here on behalf of Appellees Center 1 and Capital Management Services, asking this Court to affirm the District Court's grant of summary judgment in favor of the employers with respect to Mr. Ford and the EEOC's failure to show a constructive discharge in this case and failure to show any adverse employment action taken against Mr. Ford. Ms. Mahler, can you clear up? Are you arguing that sincerity is an issue in this case, or do you concede, as the District Court found on procedural grounds, that there is not a basis to question his sincerity? Sure. We do dispute sincerity in this case, and this is an area where I think that the District Court actually erred in its decision. With respect to demonstrating— That's a fact-finding. So if you're disputing sincerity, that sounds like something that can only be dealt with at trial. My understanding is that the District Court was, in effect, assuming sincerity, correct? Absolutely. And to reach the appropriate decision in this case, a decision was not necessary with respect to that fact-finding as to whether the belief was sincere or not. That's not entirely clear, since the reason for the verification letter, the only relevance would seem to be that it went to his either sincerity or to notice. So if we have what's essentially a default finding by the District Court, that it was deemed admitted because of your client's failure to abide by the local rule and pointed to something beyond the answer at summary judgment, then what possible basis is there to continue requesting a verification letter? Sure. I just want to clarify that there were actually two questions that my client has had with respect to Mr. Ford's religious beliefs, and that was, first of all, the sincerity, but also the actual practices or conflict between those practices and the requirement that he be present at work on the date scheduled. There was a lot of confusion, as you'll see in the record, with respect to what Mr. Ford told the employer as to the dates that he could and could not work. And, in fact, Mr. Ford testified that he needed a religious leader to tell him which days he was unable to work based on his religious beliefs. So to the extent that the EEOC argues that a clergy letter would be unfair to employees who practice religious beliefs that do not involve clergy, I would say that's not applicable in this case because of the fact that Mr. Ford himself confirmed in his testimony that he needs a religious leader to tell him which dates he can and cannot work. But I thought there was testimony in the record from Center One employees that they had sufficient notice of which holidays he was asking to be absent. With respect to those he had already taken, they did. And with respect to, so there were the, in the course of these occurrences, it was approximately a three-week period, he missed work for, allegedly to celebrate Rosh Hashanah on October 3rd and 4th, and then needed accommodation in the form of additional time off on the 11th and possibly the 12th, although it's unclear in the record. But regardless, he was granted all of that time off with no adverse action taken against him. So to the extent that there's a question as to whether or not it was reasonable for the letter to be requested, it really is of no moment to a disposition of this case where they essentially did accommodate his religious beliefs until he decided he was going to voluntarily resign employment. One factual question, which I asked the other side, probably is more appropriate to ask of you. What does an at-will employee status mean at your company? It means that the employee- How long does it last, first of all? Well, any employee is at-will unless they are subject to an employment contract. So that would include Mr. Ford in this case. He would be at-will at all times in his employment, whether in the probationary period or thereafter. Thanks. How long, how many employees, are all the employees of Center One at-will? I believe so. I can't say for certain if anyone in another position might have an employment contract, but the vast majority would be at-will employees. Then all the more reason that your opposing counsel is correct that at-will doesn't mean anything here because if everybody is at-will and this person is asking for a religious accommodation, you have to be able to in some way deal with it. Obviously, there are concerns that you have in order to make the company run. That plays into, I think, if I'm not mistaken, the following year after this happened, the company changed its policy, is that correct? That it no longer required a letterhead stating what were the particular tenets of a particular religion? That's correct. And do you know why that change was made in the policy of the company? I don't believe that specifically is in the record why that change was made. But might that not be an issue that should come out if were there a trial? That would be a subsequent remedial measure potentially that would be an admissible trial, if this case were a preceded trial. You don't dispute that even for at-will employees that they can be terminated for any reason, but they can't be terminated for the purpose of avoiding reasonable accommodations under Title VII. Absolutely, that's correct. And, in fact, Mr. Ford was not terminated in this case, nor was he even threatened with termination, and he confirmed that in his testimony. If he was on October 19th or 20th, the day he left, at the maximum number of attendance points that could qualify for termination, is there anything in the record as to what the company intended to do? The record shows that the company was flexible with respect to what to do when an employee reached that point. And he, in fact, Mr. Ford, was at the maximum number of points several, I think, more than a week in advance of the date that he decided to resign. Let's assume that the company has been flexible in the past, but any indication here as to what the company intended to do come October 21st? What they did do was they did not terminate him at any point after he reached that particular level of points. I get that. He resigned before they terminated him. Is there anything in the record that would indicate what they intended to do the day he resigned? I would just say that there is nothing to indicate that they would have terminated him, and that would be the plaintiff's warranted to prove in this case. The idea that he was facing a possible termination, it's entirely speculative, and there's nothing in the record to indicate such. Might not that be a reason to have discovery? Oh, there was discovery in this case. And was that question asked as to what the company's intentions were the day that Mr. Ford resigned? There's nothing in the record to indicate that he was going to be terminated that day or any date in the future. There's testimony from the Center One employees that, as a practical matter, someone in his position, if they couldn't provide what was requested following the ERC meeting, would be fired with their next attendance violation, right? Correct. That would be an attendance violation and not necessarily any absence. And I think it's important to note the difference between the language that if he were to – the language that was stated to him was, if you have any more unexcused absences. And he did have excused absences. The only excuse for religious holidays that the company had communicated it was willing to accept was a verification letter on a congregational letterhead seemingly indicating that he was a member of that congregation. But, in fact, he was granted a day off on October 11th due to his simply putting in writing that he needed a change of schedule due to religious accommodation. So the facts don't actually bear out what that representative may have said. That was only a shift change under the temporary scheduling policy, right? That doesn't apply to total absences. Correct. I believe the record shows that that does apply to any change in the employee's regular schedule. In this case, it perhaps was a change in the shift, but if you look at the policies that are in the record, that TSC form would apply to any change in shift, again, from an employee's regularly scheduled shifts. At Appendix 529, there's the e-mail from the HR Generalist Robel saying that the TSCs are for a change in hours rather than for absences. Is that a disputed fact in this case? I don't believe so. I believe that there were absences here that were excused on the basis of religion, whether it was a schedule change or a shift change. They were both granted on the basis of religion in the form of Mr. Ford being permitted to take certain days off for religious observance and having no adverse action taken against him. I thought it's one time he uses it for a shift in his schedule. There was also a date. There were two dates in the beginning of October that he was permitted to take off with absolutely no, you know, by his statement for his religious observance with absolutely no adverse action taken against him. You're talking about the dates for Rosh Hashanah where he was assigned attendance points for taking those off?  That accumulated for the four plus points where he was then told that any additional excused absences in view of those points would lead to termination? I don't believe he was told any excused absences would lead to termination. I believe what he was told was he was to not have any further unexcused absences. What would a reasonable employee understand from that? That he was to follow the proper procedures to obtain a change in his schedule, whether it would be by having a discussion with human resources or submitting the temporary schedule change form. If he reached the maximum number of points, how long do you have to go? In other words, at some point you're going to have an excused absence down the road. So what's the time period in which you assess attendance points demerits? Is what you're asking whether they fall off at some? Let's say he's reached the maximum by October 12th or whatever it was. If he had no more attendance points demerits by, let's say, January 12th or the end of the year, does it go back to zero? When does it recalculate? Yeah, I actually don't have that in front of me. I'm not certain that that's developed within the record. But the fact of the matter here is that the points were he had already been assessed enough points to, you know, in accordance with the policy potentially subject him to some form of discipline, and he was not disciplined. And, in fact, you know, looking forward to January or in the future is entirely speculative as to what could have happened. We don't know what could have happened because he resigned. The speculation, one could argue, needs to be worked out with evidence at a trial then. I'm sorry? The argument would be that it's speculation that needs to be worked out, decided on by a trial because we don't know at this point. You're telling me you don't know what the company's policy is with respect to recalculation of attendance demerit points. There's no need for a trial on the issue because the entire argument is based on conjecture, which can't be proven at trial. There's no – Well, it's not conjecture as to what the company's policy is. You just don't happen to know what the company's policy is today, right? In other words, if he were a year later to have an unexcused absence, what happens? You don't know. I don't know, but I can tell you what we do know is that he, to use the words of Judge Wigand in the district court, he'd already fallen off a cliff. He had already well surpassed the amount of disciplinary points to render him eligible for termination, and he was, in fact, not terminated. So I would say to answer your question, the policy is flexible. I thought he was at the maximum, and he only did the extra half day, the day he actually resigned. No, I believe he was at five and a half points as of the middle of the month, as of the ERC meeting. Excuse me. Is there any difference between maintaining attendance points on a new at-will appointee as opposed to a regular at-will employee? I believe the policy is such that a certain number of points may render a probationary employee or someone within their first month or two of employment. I believe the attendance points accumulate at a faster rate or at a higher rate than someone who might have been with a company for two or three years. But for the purposes of disposing of this case, it's really irrelevant because, in actuality, the points were meaningless in the sense that they led to no adverse employment action against Mr. Ford. So if we're not going to take eligibility for termination as adverse action, that doesn't necessarily answer the constructive discharge question, right? Because you agree constructive discharge doesn't have to wait to be fired if the conditions rise to the level of meeting our circuit standard. Absolutely. And I would argue that the facts of this case certainly do not rise to the level of intolerability that the relevant cases would suggest. Would you agree that if an employee is faced with situations, as in the Fourth and Fifth Circuit, where it's a choice between following your religious practice or inevitably being fired, that that is an intolerable condition? I would say it depends on the condition. So, for example, you know, with respect to the consul energy matter from the Fourth Circuit that the plaintiff, excuse me, that the appellant cited in their brief, the set of circumstances there was that an employee was required to scan his hand upon appearing for work. So that was an extra step required of him to do his job. In this case, Center I only asked Mr. Ford to appear for work, and if he could not appear for work, please let us know ahead of time what dates you cannot appear for work. So it's entirely distinguishable. They didn't ask to know what date. It provided them a calendar. They were requiring that he provide a verification letter on a congregation's letterhead, right? They were, but there was certainly a question on my client's part as to both sincerity and the dates. Per Mr. Ford's testimony, he was unclear without a religious leader what days he would need off. We have your employees saying they had sufficient notice about what days he needed to have off. Perhaps there are others who were confused about that, but wouldn't that just be a question for a jury to determine whether the company had that notice or not? Well, it might be a question for a jury had he been subject to some adverse employment action, but he wasn't. Well, he is told, Andrea Rebell says in her email, that they needed a letter from the congregation with an official letterhead explaining the days and times he needed off to accommodate additional days off. So future absences without that letter, they were not going to accommodate. Well, I would note that the email that you're referencing, that was not to Mr. Ford. That was not a statement that was made to Mr. Ford. That was a question that Ms. Rebell was posing to other HR representatives within the company. So if we're looking at Mr. Ford's objective belief as to what was going to happen in the future, he had been given no such guidance. Can I, before you sit down, just return to the sincerity point? You say you are challenging his sincerity? I don't believe that. Questioning his sincerity, I guess. I don't believe that the issue of sincerity is necessary to disclose of the appeal before the court here. The district court accepted as fact that the sincerity of the religious belief. I thought your briefing did as well, did it not? I'm sorry? I thought your briefing did as well. Right. In the context of looking at the prima facie case of religious accommodation, it's unnecessary to even look at the sincerity element. If you accept sincerity and your employees testified that they had notice of the holidays that he wanted off, then what is the objective basis for requiring the letter from a congregation in order to excuse his absences on additional days? And I would just disagree with the court's characterization of it as a requirement, given that he did not at any time provide such letter and no action was taken against him. Okay. Are there other questions? Okay. Thank you. Thank you. I have a number of record points I'd like to clear up. I hope I can get through all of them. The first is I'd like to address the contention that Mr. Ford was granted an excused absence when he filled out the temporary schedule change form. That's incorrect. He used the temporary schedule change form to shift his work hours from 12.30 p.m. to 9.00 p.m. to a schedule of 9.00 to 5.30 p.m. to accommodate being home for sunset. He was never granted time off, excused time off, excuse me. And there's not any record evidence that anybody ever told Mr. Ford that that form was the mechanism for asking for an accommodation. And, in fact, Center One's representative testified he should speak to HR to get an accommodation. Second, the court asked what evidence there was of what Center One intended to do after the Employment Review Committee meeting, and I'll point your honors to Ms. Altman's statements both when she spoke with Mr. Ford when he resigned and she reiterated that Center One would accommodate him but only if he could provide the letter, and if he can't provide that letter, then we can't accommodate you, as well as the unemployment form that she filled out after the fact attributing his resignation to his inability to comply with their requirement. Those are at pages 647 and 684 of the record. Third, I want to address Center One's possible dispute of sincerity in this case and just point your honors to the fact that Ms. Brugos, whose name was Ms. Robel at the time, and Mr. Lewis both testified that they did not question Mr. Ford's sincerity. That's at page 217 for Ms. Brugos and 374 for Mr. Lewis, who testified that, as a general matter, Center One did not question employees' sincerity. Fourth, I'd like to address that Mr. Lewis testified that they changed their policy in 2017, and he specifically tied that change in policy to the situation with Mr. Ford. That's at page 401 of the record. Is that appropriate for us to consider? We haven't. In the district court, Center One argued that that is inappropriate for the court to consider, and it did not come up in briefing on appeal. I think that it's not a question of liability. It's a question of, I think, the reasonableness of their policy and whether they actually needed it, and I think it goes to the fact that it wasn't necessary for them to be able to accommodate an employee to require this form of verification. And I think also to the extent that there are concerns about making the company run and having employees show up at work and having to be able to predict that, I think that might be a question that goes more to undue hardship, which is not something that Center One has raised in this case. I would like to reiterate that there are certain days that if you're in an excused absence, we're hurting like a Monday. So there is evidence that you have to have people there to do the work. That is correct, Your Honor, but I think that whether or not accommodating Mr. Ford's religious practice was going to interfere with their ability to do the work is really an undue hardship question, which comes after the prima facie case, and Center One hasn't argued that it would have been a hardship on their business to accommodate his religious practice and isn't a reason that they were asking for this letter. I would point, Your Honors, to the record shows that attendance points do disappear after 180 days, but Mr. Ford testified in the calendar show that he had more religious holidays coming up within the month of October, so the next step when he reasonably perceived that he would be terminated was coming within a matter of weeks, not after any attendance points would have fallen off of his record. To the argument that Center One exercised discretion in not firing Mr. Ford and that that somehow makes it unreasonable that he resigned, Mr. Ford reasonably perceived that he was going to be terminated the next time he took a day off, and as I mentioned before, this is precisely why we have a constructive discharge theory of liability. Employees are not required to wait around until their employer decides to fire them when they are put in these intolerable circumstances and are told that they can afford no more unexcused absences and they must comply with this requirement in order to receive an accommodation. I see that I've gone over my time, and I appreciate Your Honors' indulgence. Thank you very much. We ask for a reverse and remand. Okay. I think there had been additional reservation of time, which you're not going to take at this point. No, I didn't. I wasn't given any particular time. Okay. All right. Thank you. We'll take the case.